Filed 10/10/14  Annette M. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANNETTE M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF MONTEREY COUNTY, <br><br> Respondent, <br><br> MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES, <br><br> Real Party in Interest. | No. H041155 <br> (Monterey County <br> Super. Ct. No. J47082) |

L.M., a minor who is now seven years of age (the minor), was placed in protective custody on March 6, 2013.  Thereafter, the Monterey County Department of Social and Employment Services, real party in interest (Department), filed a petition under Welfare and Institutions Code section 300, subdivisions (b) and (g), alleging the failure of the minor's mother, Annette M. (Mother), to protect and provide support for her child, and that the minor had been left without any provision for support due to Mother's

incarceration.[1]  It was alleged that Mother was in the Monterey County Jail as a result of a January 2013 domestic violence incident in which she had attacked the minor's father, Robert M. (Father); the minor witnessed the attack.  (Mother later pleaded guilty to a felony, infliction of corporal injury on a spouse, received probation, and was released from custody in or about May 2013.)  Members of the family had reported that Father was an alcoholic and Mother was "very violent."  On the date of the referral to the Department (March 6, 2013), Father had died, the minor's great grandmother with whom she and Father had been living had been hospitalized, and the remaining relative in the home was unable to care for the minor.

On April 24, 2013, respondent superior court found the allegations true and sustained the petition.  It ordered that family reunification services be provided to Mother, pending the results of a court-ordered psychological test.  Two psychological examinations were performed by separate professionals.  Both concluded, among other things, that Mother suffered from alcohol dependence and a narcissistic personality disorder.

At the six-month review hearing in October 2013, the court continued the minor's out-of-home placement and Mother's reunification services.  It also set a 12-month permanency hearing for April 22, 2014.  It admonished Mother that if she failed to reunify with the minor by that date, the court could permanently deprive her of custody of the minor.

A contested 12-month permanency hearing was held on June 23, 2014.  As of that time, Mother had made substantial progress with her sobriety, having, among other things, completed a residential treatment program, regularly attended Alcoholics Anonymous (AA) meetings, and maintained her sobriety for more than one year.  She had secured part-time employment, but did not have stable housing.  Her regular

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

visitation of the minor had not progressed beyond the supervised stage. Both Mother's case worker and her therapist opined that (1) Mother was not in the position where she could safely parent the minor; and (2) the minor would not be able to safely return to Mother's custody even if reunification services were extended to 18 months after initial removal. After receiving evidence, including testimony from four witnesses, the court terminated Mother's reunification services and set a selection and implementation hearing under section 366.26 (hereafter, a .26 hearing) for October 21, 2014.

Petitioner Annette M. seeks a writ of mandate to compel respondent superior court to vacate its Order. She challenges the court's termination of her reunification services, contending that the court erred in its two essential findings, and that it relied on improper rationale in reaching its conclusions. Specifically, Mother contends the court erred in finding (1) there was not a substantial probability that the minor would be returned to her custody within 18 months of initial removal; and (2) reasonable services had been provided or offered by the Department.

We conclude that respondent court did not commit error in setting a selection and implementation hearing under section 366.26 and in terminating Mother's reunification services. There was substantial evidence supporting the court's first finding that the minor could not be returned to Mother's custody within 18 months of her initial removal. As to the second finding relating to services offered, any claimed error was forfeited. But even if we were to consider that claim, there was substantial evidence supporting the juvenile court's conclusion that reasonable services had been provided or offered by the Department. Since substantial evidence supported the court's findings, any claim by petitioner that the court relied upon improper rationale in reaching its conclusions is of no consequence. Accordingly, we will deny the petition.

3

FACTS AND PROCEDURAL HISTORY

I.    *Petition and Detention Order (March 11, 2013)*

On March 8, 2013, the Department filed a petition alleging that Mother had failed to protect the minor and that the minor had been left without any provision for support due to Mother's incarceration.  (§ 300, subds. (b), (g).)  The Department alleged,[2] among other things, that Mother and Father have one child, the minor.  The Department had received four referrals concerning the family since 2010.

The Department alleged that the current referral occurred on March 6, 2013.  It was reported that Father had died that morning, and "the 94-year[-]old great grandmother" with whom the family was living had been hospitalized that day.  No one was available to care for the minor, as Mother was incarcerated.  "The family reported concerns about [the minor] being exposed to many traumatic events in her short life.  [Father] was an alcoholic and [Mother] is very violent."  The family also advised there was a restraining order in effect until July 14, 2013, to protect Father and the minor from Mother.  The social worker met with the minor in her bedroom and observed that there was a strong odor of cat urine, clothes were strewn about, and there were three fishbowls with dead fish.  The minor was placed in protective custody.

Mother was in custody for attacking Father in their home on January 11, 2013.  The minor witnessed the incident.  Mother was charged with causing or permitting cruelty to a child, infliction of corporal injury on a spouse, spousal battery, assault with a deadly weapon, and resisting a peace officer.  Mother pleaded no contest on February 26, 2013, to inflicting corporal injury on a spouse and resisting a peace officer.

---

[2] The statements made in this paragraph and the succeeding two paragraphs are based upon the allegations made by the Department in its petition.  For simplicity and to avoid repetition, we have generally omitted the phrase "the Department alleges in its petition" in describing the allegations in the petition.

On March 11, 2013, the court ordered the minor detained pursuant to section 319, subdivision (b).

II.    *Family Mental Health Assessment Report (April 2013)*

A family assessment report, filed April 19, 2013, was prepared at the Department's request by Katherine Donahue, Ph.D., a psychologist with the Monterey County Department of Mental Health. Dr. Donahue "strongly recommended" that Mother not be permitted to view the evaluation because of extensive domestic violence in the home, and because there were "many factors that raise[d] concerns about the safety of [the minor], if the nature of these disclosures were made known to [Mother]."

A.    Evaluation of Mother

Dr. Donahue interviewed Mother on April 12, 2013. She opined that "[t]hroughout the evaluation, [Mother] employed deceit and exhibited impaired insight"; was condescending; placed blame on others; and denied her alcoholism, domestic violence, and role in the dependency proceedings. "[S]he was preoccupied with thoughts of being persecuted by an extended family member. She also gave conflicting reports of various life events." Her acts of dabbing at her eyes with a tissue throughout the evaluation "seemed to be an attempt to influence [the] examiner." There was only one occasion when Mother showed emotion or distress: "when she was asked about pornographic materials and toys found in the home." Dr. Donahue had asked about a box of pornographic magazines and sex toys that were reportedly found in the minor's bedroom. Mother became agitated and blamed a relative with having moved the box into the minor's room in order to frame her.

Mother's parents divorced when she was three years old. After the divorce, Mother and her mother moved from Fontana to Santa Monica, California. Her mother remarried when Mother was seven, but Mother did not disclose any information about her stepfather. When Mother was approximately 14 years old, the family moved to Monterey. Mother claimed that she was briefly a runway model as a teenager, but that

5

she quit because it was not a healthy lifestyle. Mother told Dr. Donahue that she had dropped out of high school when she was a junior because she had become " 'bored' with academics." Mother claimed that when she was 17, she worked as a professional photographer for Nordstrom's and Neiman Marcus. At about this time, Mother met her first husband, whom she claimed "was a 'philanthropist,' who was independently wealthy at the age of nineteen." They married after five years of dating and he pressured Mother into having "an 'open relationship.' " The relationship ended after 13 years. Mother then obtained an Associates of Science degree in medical assistance at Monterey Peninsula College.

Mother began dating Father in 2005 and she became pregnant with the minor approximately six months later. Mother reported to Dr. Donahue that "matters within the family were 'perfect' until 2012" when Father lost his job after going to work intoxicated. She said they lost their home and became homeless. Mother indicated that Father was an alcoholic and that as his alcoholism and depression worsened, he "became 'very violent.' " She separated from Father, and she and the minor stayed in local domestic violence shelters. In late 2012, Mother—giving Dr. Donahue conflicting reasons for having done so—moved into the home of the minor's paternal great-grandmother; Father and his father also lived there.

Mother stated that on the evening of January 10, 2013, she had an argument with Father about his buying more vodka.[3] She admitted to Dr. Donahue that she had consumed a bottle of wine, "but denied having a problematic use of alcohol." Dr. Donahue noted that "[t]his information conflicts with reports from other sources, including [the minor's] reports of [Mother's] frequent, problematic use of alcohol." Mother gave conflicting accounts about the events. She said that Father pushed her into furniture, causing an empty bottle to fall and break. In an ensuing struggle, they were

---

[3] Dr. Donahue noted that Mother stated that the argument occurred on the evening of January 9, but the records indicated that it occurred on January 10.

both cut by the broken bottle. She later told Dr. Donahue that there was an empty wine bottle on the floor and she was lying on top of it with Father pinning her to the floor. She attempted to place the bottle in the trash, but Father wrested it away from her and the bottle broke against a table. Mother claimed that Father was very drunk and tried to strangle her. At some time during the struggle, Father was cut by the broken bottle and he bled profusely. She claimed that Father tried to frame her by throwing blood on her and by smearing it all over the walls.

Mother claimed that although she was wrongfully accused of the assault, she accepted a plea agreement " 'to take care of [her] daughter.' " She told Dr. Donahue that, although there was evidence against Father and he had a long history of domestic violence, she did not have the money to contest the charges. Dr. Donahue commented in her evaluation that "[Mother's] claims of being the victim of domestic violence conflict with police records and reports from her daughter."

Dr. Donahue also noted that Mother said she did not have a history of mental health problems. Later in the evaluation, Mother admitted she had received mental health treatment "since 2000 due to 'circumstantial depression' following her divorce." Dr. Donahue also noted that records reflected that on August 19, 2010, after a referral, Mother was placed on an involuntary psychiatric hold pursuant to section 5150 after drinking alcohol and throwing a glass at Father in the minor's presence.

B.      Evaluation of the Minor

Dr. Donahue interviewed the minor on April 9 and 15, 2013. The psychologist observed that the minor was anxious throughout the evaluation and initially presented as detached in describing past traumatic events. Later, she "became increasingly distressed as evidenced by: tearfulness, avoidance of eye contact, flushed face and her voice cracked at times." It was reported to Dr. Donahue that the minor had problems adjusting initially to the new surroundings of her foster family and "exhibited 'smacking' and hitting." The foster parents had been able to address these issues, and the minor had been

7

following the rules of the house. The minor was reportedly "very sensitive to any stress in the home, and [would] often tell her foster siblings, 'Please make good choices.' "

Dr. Donahue asked the minor about events resulting in the detention. "[The minor] stated[:] 'Mommy needs a time out from me and Dad . . . Mommy is still on a time-out from my Daddy to think about what she has done.' [The minor] spoke in detail about the severe domestic violence that she witnessed in the home that was perpetrated by [Mother] against [Father]. [The minor] reported[] that [Mother] 'hits [Father] and makes him bleed. Broke a bottle, cut his arm and made him bleed . . . Hit him with a rock, a stone, on the arm . . . Hits him all the time . . .' [The minor] reported that she was 'very scared' and 'worried about when Mom was hurting my Dad.' [The minor] noted that she would often 'tell them to stop' or hide in her room . . . [Dr. Donahue] inquired about whether [the minor] witnessed an isolated incident of domestic violence, [or] whether the violence occurred on multiple occasions, to which [the minor] stated, 'Many times. All the time . . . Whenever Mom drinks.' " The minor had reported the same type of conduct concerning domestic violence to her foster mother, saying that the abuse was " 'always Mom, never Dad' " and that Mother " 'gets crazy when drunk. Tries to hurt [Father].' "

The minor told Dr. Donahue that she thought about Father constantly, and dreamt about him most nights. It was reported that the minor had said: " '[I] see bad pictures in my head of Mommy hitting Daddy. Blood everywhere.' The foster mother stated that [the minor had] denied experiencing nightmares." Dr. Donahue opined that the minor possibly was not yet comfortable enough with her foster parents to share her nightmares with them. The minor expressed sadness to Dr. Donahue about Father's death.

The foster mother also indicated that the minor appeared to be preoccupied with sex and talked about it constantly. The minor was easily upset by photographs of people in swimwear. But it was reported the minor was "not exhibiting any sexualized, acting-out behaviors." During the interview, the minor said she had been exposed to

8

pornography. She said: " 'See naked people doing stuff . . . Wanted to see what it was . . . made me upset.' " She also reported that " 'Mom draws nasty stuff. No clothes on people . . . Mom draws pictures of naked people. This really upsets me. It's not appropriate for me to see naked people.' " The minor denied that she had been sexually abused or that she had witnessed sex acts in the home, but reported having seen sex toys and expressed some familiarity with Mother's use of them.

The minor told Dr. Donahue that she loved and missed Mother and wanted to live with her again. The minor perceived that in order for that to happen, Mother "has to 'not drink anymore . . . she has to stop doing fights with anybody.' "

C.    Family Visitation

Dr. Donahue observed visits of Mother and the minor on April 3 and 11, 2013. The psychologist opined that Mother's behavior during the visits "was inappropriate and erratic: she spoke incessantly, the tone of her voice was condescending in nature, her thought processes were tangential and her mood was labile." Mother talked over the minor and interrupted her and showed "inappropriate behavioral expectations for [the minor]." Mother's discussions were focused on her own interests and needs. She lectured her daughter and expected her to remain seated throughout the visits. Mother also "failed to respond to [the minor's] attempts to direct her attention or engage in an activity of interest [to the minor]." The minor did not seek physical affection from Mother, and her response to physical affection from Mother was often stiff; she did not embrace Mother. Dr. Donahue reported further that, despite Mother's being counseled about subjects that were inappropriate, she focused on Father's death during visitation; "attempted to manipulate" unsupervised visitation; and tried to determine details about the location of the minor's foster home and school.

Dr. Donahue summarized that Mother "struggled to interact with her child in a developmentally-appropriate manner. Rather, [Mother] responded to [the minor] as though she were a much older child. . . . [Mother] sought support and nurturance from

9

[the] child, and at times, it was as though [Mother] were the child in the visitation. It was apparent that the focus of the visitations were upon [Mother's] needs and interests[,] not the needs and interests of the child." Because of Mother's noncompliance with counseling and recommendations of the social worker during visits, her "attempts to manipulate the situation," and her "erratic behavior," Dr. Donahue was concerned about Mother's judgment, mental health, and sobriety.

D.      Findings and Recommendations

Dr. Donahue described the minor as having "taken on the role of a lost child: a quiet, inconspicuous child whose needs are often lost in the family system. Since the attention of the family system is focused upon [Father's and Mother's] substance abuse, and likely meeting [Mother's] needs, [the minor's] needs may be lost [or] forgotten." Dr. Donahue opined that the minor "presents with clinically-significant emotional reactivity, hypervigilance, restricted range of affect, withdrawal, and intrusions of trauma-related memories. These symptoms are consistent with chronic, and untreated, Posttraumatic Stress Disorder (PTSD) in children. [The minor] also presents with an anxious-disorganized attachment style. Children with a disorganized attachment are often confused and inconsistent in their responses; they may vascillate between appropriate behavior and extreme, behavioral outbursts."

It was Dr. Donahue's recommendation that the minor receive mental health treatment in a group or individual therapy format to help address her exposure to domestic violence, substance abuse, and separation from her family. The therapy, Dr. Donahue opined, would also help the minor "address her trauma history and attachment issues as she can learn that adults can be trustworthy and dependable." The psychologist also recommended further evaluation of the minor in order to verify a diagnosis of dysgraphia, which is "an '[i]mpairment of the ability to write, usually caused by brain dysfunction or disease.' [Citation.]" (*Maus v. Wappingers Cent. School Dist.* (S.D.N.Y. 2010) 688

10

F.Supp.2d 282, 288, fn. 1, quoting Dorland's Medical Dictionary for Health Consumers (2007).)

Dr. Donahue concluded that Mother "presents with an extensive history of domestic violence and substance abuse that impedes her ability to effectively meet the needs of her child at this time. [Mother] lacks healthy coping strategies, and her substance use serves as a means to manage stress. Her substance use, however, contributes to behavioral and mood dysregulation and subsequent episodes of violence[,] creating an atmosphere of danger and unpredictability in the home. [Mother's] substance use, and violent behavior, communicate[] that her needs supersede the needs of all other family members." It was Dr. Donahue's "strong[]" recommendation that Mother participate in a court-ordered psychological examination.

III.    *Report and Jurisdictional/Dispositional Hearing (April 24, 2013)*

In its April 19, 2013 jurisdiction/disposition report, the Department repeated the allegations in the initial petition and incorporated the family mental health assessment. The Department noted that after the minor was placed in protective custody, pornography and sex toys were found in the minor's room. The minor also told the social worker that she had seen the toys, and she had expressed some knowledge about Mother's use of them. The report also provided additional detail concerning the prior referrals of the family to child welfare.

A.    Prior Referrals

There was a referral in August 2010 involving reported physical and emotional abuse by Mother that resulted in Mother being placed in an involuntary hold for psychiatric evaluation. The Department indicated that Mother had thrown a glass at Father after she had been drinking. Mother had not taken responsibility for her drinking, saying she had been drinking due to stress associated with the recent death of her father. The Department noted, however, that her father was in fact still alive. Mother reported she had had thoughts of driving her car off of a cliff, but could not leave the minor.

11

Mother had tried "to minimize the seriousness of the situation, and instead [had] blamed the police for taking her to the hospital."

On June 24, 2012, an officer with the Seaside Police Department visited Mother and Father's home in response to a 911 hang-up call. The officer observed that Father's forehead was red, an area of his face had been scratched and had been bleeding, and that both forearms had bumps and were bleeding slightly. Father reported that after he had consumed nearly one pint of vodka and his wife had consumed two bottles of wine, she had thrown a plastic wastebasket at him, striking him in the head. She had then raised an open, half-empty beer bottle over her head and advanced toward Father. Father halted her progress. She then bit him on the arm, grabbed a vodka bottle and attempted to strike him with it. Father stopped her and poured vodka on her head. Father restrained Mother, but after letting her go, she punched him approximately 15 times. The minor was present when the incident occurred. She told the officer " 'that she was tired of her mom hitting her dad.' " Mother was arrested but was not prosecuted.

On July 31, 2012, a Seaside police officer responded to the home of Mother and Father as a result of a report of a woman screaming. Father indicated he had gotten into a verbal altercation with Mother; it did not become physical and he removed himself from the situation. "[Mother] reported that she 'was screaming at [Father] because she was upset over various issues.' "

On August 28, 2012, at approximately 10:30 p.m., the Seaside Police responded to two calls. One call was from a woman who reported that Mother had thrown several rocks at her car because she thought the driver had been speeding. The second call was from a woman reporting that people were chasing her. Mother told the officer she had thrown a rock in the road to see how fast a car was traveling; she denied that the rock hit the car. She then said "that her daughter was almost killed and that the people in the vehicle were responsible for manslaughter. . . . [Mother] said her daughter was crossing the street and the vehicle almost hit her." The minor then said, " '[N]o I wasn't.' "

12

Mother told the officer the car was traveling at about 25 to 30 miles per hour, and then "she 'began yelling about how the vehicle was going 70 to 80 mph. . . .'" The driver of the car declined to press charges, telling the officer that she doubted Mother's sanity.

On January 10, 2013, shortly after midnight, Seaside police officers responded to a report of a domestic fight. Father's T-shirt was completely soaked in blood and he was holding a towel on his left forearm "over what appeared to be the largest of several lacerations." Father also had several scratches on his face and arms. Mother had blood on her feet and hands but had no visible injuries. Officers observed that there was blood on the floor and walls in the hallway leading to Father's bedroom, and that "[t]here was blood splattered on every wall of the room[,] as well as large puddles on the floor."

Mother told police she and Father had been drinking earlier in the evening and had gotten into an argument because Father was being loud and preventing their daughter from sleeping. Mother gave contradictory versions of the events. She first said that Father had picked up a bottle and had broken it over some furniture and had lacerated his arm. Mother later told the officer that Father "had grabbed the bottle and she had broken it while struggling to take it away from him." According to the officer, Mother's breath smelled of alcohol, her speech was slurred, and she "incoherently ramble[d] on about how [Father] had pushed her and tried to choke her." The officer found no marks on Mother's neck.

While being treated at the emergency room, Father told the police that after putting the minor to bed, he and his wife were drinking wine and watching television. Mother was arguing with him because he was too loud. After approximately 10 minutes, Father got up to leave the room, and Mother struck him in the face, "knocking his glasses off and effectively blinding him." Father grabbed Mother's hands to keep her from striking him. They fell onto the bed, began struggling, and Mother scratched and bit him. When Father was able to get off the bed, he felt a sharp blow to his left arm and heard breaking glass. He said he did not see what had hit him because he wasn't wearing his

13

glasses. The police officer observed scratch marks on both of Father's arms and his face, an apparent bite mark on his left arm, and lacerations and gouges on his left arm. According to the officer, the wounds were not consistent with shrapnel from a broken bottle as originally stated by Mother, but were consistent with having received a direct blow from a glass object.

The police officer met with the minor and asked her some preliminary questions; the officer opined that she had answered coherently and articulately. The minor, who was on the bed next to her parents, said that her parents had been drinking wine and had begun yelling at each other. Mother then struck Father, and he " 'defended himself' " by grabbing Mother and falling on the bed. The minor related that after Father got up, Mother struck him with a bottle and he began bleeding badly. She "hid under her blanket and yelled for them to stop because she thought her dad was going to die."

After the hospital interview with Father, Mother was placed under arrest. She resisted efforts of multiple officers in transporting her to the patrol car.

B.      Request to Amend the Petition

Prior to the hearing, the Department in a supplemental report requested that the petition be amended in several respects. Based upon consultation with Mother's attorney, it asked that references in the petition to Mother's " 'alcoholism' " be replaced with " 'alcohol use,' " and that it be noted that Father had been sick with pneumonia before his death. Although Department agreed to the change concerning Mother's alcohol use, it indicated the request was indicative of Mother's being "in denial of [the] impact that alcohol has had on her life." The Department rejected a change to the petition proposed by Mother's counsel that Mother had been incarcerated due to Father's domestic violence. The Department indicated that all evidence was that Mother had been the aggressor, and the evidence had been sufficient to warrant an arrest and conviction. It noted that "[t]his is another indicator that the mother fails to take responsibility for her actions, and projects responsibility onto others." The Department also noted that Mother

14

had received three years' probation along with a condition that she serve 180 days in county jail as a result of her felony conviction from the domestic violence incident in January 2013; it requested the petition be amended to reflect that Mother had been released from custody.

It was recommended by the Department, among other things, that the court sustain the petition; declare the minor a dependent of the court; remove the minor from Mother's custody; find that out-of-home placement of the minor continued to be necessary; and set a selection and implementation hearing for August 21, 2013. Although the Department initially recommended denial of services and visitation, it ultimately recommended that reunification services be offered to Mother, pending a psychological evaluation, and that she receive visitation rights.

### C. Hearing

On April 24, 2013, after a jurisdictional and dispositional hearing attended by Mother, the court found the allegations in the petition true and sustained the petition. The court declared the minor a dependent child of the juvenile court. It ordered further that the minor would continue to be placed outside the home; family reunification services would be provided to Mother, pending the results of a psychological evaluation; visitation of the minor would be provided to Mother; and that the likely permanency date was August 21, 2013. It approved the case plan proposed by the Department. Under that case plan, Mother was required to obtain counseling; attend a domestic violence program; complete a psychological evaluation and a second evaluation if requested; attend a parenting education program; obtain and maintain adequate housing; attend at least four weekly AA meetings; maintain a 12-Step sponsor and work on the 12-Step program; participate in random alcohol testing; and maintain sobriety.

The court scheduled a six-month review hearing for October 23, 2013.

15

*IV. Psychological Evaluation of Mother (May 2013)*

On April 29, 2013, a psychological evaluation of Mother was performed by Elizabeth K. Lee, Psy.D., a licensed clinical psychologist. In her report (filed in May 2013), Dr. Lee reviewed in detail Mother's personal background, mental health, and criminal history; her history with child protective services; her background concerning the minor and the circumstances resulting in the proceedings; the substance of Dr. Lee's interview with Mother; and the results of psychological testing.

Dr. Lee reported that Mother "gave long, rambling answers to [her] questions and often contradicted herself. It was unusually difficult to get basic questions answered by her, such as her educational and family history." Mother told Dr. Lee that she had been falsely charged with domestic violence in January 2013 and that Father had hurt himself when he had fallen on a bottle. Dr. Lee opined that Mother lacked insight about the impact her behavior had on the minor.

Mother was given a Minnesota Multiphasic Personality Inventory, second revision, standardized psychological evaluative test (MMPI-2). The results disclosed that she had "recurrent problems with impulse control," and tested "as prone to family conflicts and to a past history of marital conflicts. [Mother] could easily lose control of her drinking as well as los[e] control over herself when she is intoxicated. A serious risk of loss of [judgment] and impulse control through drinking is indicated. This is consistent with [Mother's] history of engaging in domestic violence while intoxicated." Dr. Lee concluded that Mother's "MMPI-2 profile is consistent with a diagnosis of narcissistic personality disorder. She can be self-centered and manipulative in her relationships with others." The psychologist indicated that while Mother stated she was depressed because of Father's death as well as the death of her mother, the testing disclosed that she was "not currently experiencing either depressed mood or anxiety."

Dr. Lee concluded that Mother suffered from "a severe personality disorder that interferes [with] her ability to feel empathy for her daughter's distress. [Mother] has little

16

to no appreciation of the harm that this has done to her daughter. Instead, she has repeated her mother's pattern of putting her daughter's needs behind her own and exposing her to neglect and abuse." Dr. Lee concluded that "[ev]en if [Mother] were to participate in a residential substance abuse treatment program for treatment of her alcohol dependence, she would be unlikely to make enough progress in her other problem areas to reunify with her daughter within the time allowed by law. If [the minor] were returned to [Mother's] care, she would continue to be exposed to domestic violence and neglect." Dr. Lee recommended that Mother be denied reunification services.

V.      *Report and Six-Month Review Hearing (October 23, 2013)*

The Department submitted a report on October 11, 2013, in advance of the six-month review hearing. It detailed the history of the proceedings and referenced reports prepared by professionals concerning the minor and Mother, including Dr. Lee's psychological evaluation of Mother. The Department reported that the minor was placed in a nonconcurrent foster home (i.e., a foster home in which the family had not indicated a willingness to adopt) in Monterey County.

The social worker noted that Mother had entered a residential treatment program, Door to Hope, on May 28, 2013. Although Mother initially "was in denial about her addiction and blamed her late husband for her [alcohol] use," she had later verbalized that her use of alcohol was not entirely Father's fault and that she would have continued to look for alcohol even if Father had moved out of the home. Mother had significant behavioral problems initially with the Door to Hope program. But she actively participated in group sessions, her behavior improved, and she earned a graduation certificate on September 15, 2013.

The Door to Hope program's discharge recommendations included attendance at Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings and weekly attendance at Door to Hope aftercare. At the time of the Department's report, Mother was attending at least four AA/NA meetings per week; was working with a sponsor; had

17

completed Step 3 of the 12-Step program; had attended one aftercare session; and had tested negative for alcohol at all screenings performed before her weekly visits with the minor.

The Department also reported that during her stay at Door to Hope, Mother had completed a Triple P parent education course on August 23, 2013. She was an active participant and was able to discuss concepts she had learned with the social worker. Mother still demonstrated unrealistic expectations for the minor based upon her developmental age, but was learning to present things to her daughter in a more age-appropriate manner. Mother was also required as a condition of probation to complete 52 weeks of domestic violence courses; she had completed 18 classes.

The social worker noted that from her observations of one-hour weekly supervised visitations with the minor, Mother initially was focused on meeting her own needs. The social worker opined that the overall interaction between Mother and the minor was positive. She noted, however, that throughout the dependency, there had been safety concerns regarding Mother's visits, including her efforts to gain information about the minor's school and foster placement, despite admonishments to Mother against doing so. At the visit on July 23, it had been reported that Mother had attempted to sneak letters to her daughter by hiding them in books; this behavior was viewed "as another attempt to avoid Department oversight."

The Department concluded that returning the minor to Mother's physical custody would create a substantial risk to the child's safety, protection or physical or emotional well-being. It indicated the probability that the minor could be returned and safely maintained in Mother's physical custody was then unknown, in part because a second psychological evaluation of Mother was then pending. The Department also recommended that Mother's reunification services be continued.

The six-month review hearing took place on October 23, 2013. The court adopted the findings and orders as recommended by the Department. It ordered that the minor

continue as a dependent of the court in out-of-home placement, and that reunification services continue to be provided to Mother. It set a 12-month permanency hearing for April 22, 2014. The court specifically admonished Mother that if she failed to reunify with the minor on or before that date, the court could permanently deprive Mother of custody of the minor.

VI.     *Second Psychological Evaluation of Mother (December 2013)*

On July 24, 2013 (prior to the six-month review hearing), the court ordered that Mother submit to a second psychological evaluation. A second licensed clinical psychologist, Elaine Finnberg, Ph.D., interviewed and evaluated Mother on September 6, 2013. She prepared a report that was not available at the time of the six-month review hearing; it was filed with the court in December 2013.

Psychological evaluation and testing by Dr. Finnberg yielded results similar to those obtained by Dr. Lee. Dr. Finnberg reported that based upon the MMPI-2 test she administered, Mother's "personality profile . . . indicate[d] a personality disorder." It was indicated that Mother showed "[r]ecurrent difficulties in impulse control" and a likelihood that she would "be seen as acting out in egocentric and self-indulgent ways . . . . Difficulties with alcohol could become disruptive to her controls. . . . Problems with anger and irritability appear chronic. She could be disruptive and possibly dangerous to others, either because of her temper or through her impulsiveness." Dr. Finnberg also noted with regard to Mother's personality profile that "[s]erious risk of loss of judgment and impulse control through drinking is indicated. A large majority of individuals with this personality pattern have shown little or no long-term change in response to psychotherapy."

Dr. Finnberg's diagnostic impressions included alcohol dependence (Axis I) and narcissistic personality disorder (Axis II). She concluded: "The combination of [Mother's] serious alcohol abuse and narcissistic personality disorder has resulted in the chaotic and violent behavior in which she has been engaged in the past. In my opinion,

19

whether or not she is able to benefit fully from reunification services depends mostly on her ability to refrain from all use of alcohol. Should she resume alcohol abuse, the likelihood that she will resume her dysfunctional behavior is great." Dr. Finnberg recommended that Mother be offered reunification services with a focus "on controlling her own substance abuse and understanding the effect her substance abuse has had on her daughter."

VII.    *Twelve-Month Review Hearing and Challenged Order (June 23, 2014)*

Pursuant to section 366.21, subdivision (f) (hereafter, § 366.21(f)), a contested twelve-month review hearing, originally set for April 22, 2014, took place on June 23, 2014. The Department, the minor, and Mother were all represented by counsel, and Mother was also present. The court received and considered evidence (discussed below), which consisted of the Department's April 11, 2014 status report and addendum; a treatment update and amendment; two packets of materials supplied by Mother's counsel; and the testimony of four witnesses. It also received trial briefs from Mother and the Department.

A.    Department's Status Report

The Department submitted a report on April 11, 2014, in advance of the twelve-month review hearing. The social worker, Tameka Hill, noted in the report that Mother had addressed her substance abuse issues and graduated from the Door to Hope program on September 15, 2013. Since her discharge, Mother had attended approximately 60 percent of her aftercare sessions. Door to Hope staff observed that Mother had been open about her substance abuse problem at the meetings she attended, but "continue[d] to monopolize the group conversations, making the sessions about fulfilling her own needs, at the expense of others' feelings." Mother was still "connected to the [AA/NA] community through attending meetings, taking on commitments, and working with her sponsor." She was working on Step 5 of the 12-Step program.

20

In addition to completing the Triple P parent education class, Mother had completed another parenting class in November 2013. Hill observed that Mother had "progressed in her ability to present age-appropriate materials to," and "plan age-appropriate activities" for, the minor. Mother had also completed 42 of the 52 weeks of domestic violence courses required as a condition of her probation. She had begun individual therapy in November 2013 with Rachel Elis, LCSW.

After completing residential treatment in September 2013, Mother moved to a shelter in Watsonville for three days and then moved into a friend's home in Pacific Grove. Later, she obtained a room for rent in Salinas, but moved out shortly thereafter and back to Pacific Grove. After a short time in Pacific Grove, Mother moved back to Salinas (her most current home) where she was house-sitting. At the time of the Department's report, Mother was in the process of applying for housing at Pueblo del Mar.

The minor was reported to be "continu[ing] to exhibit challenging behaviors, including yelling, physical aggression, destruction of property, emotional meltdowns, and refusal to be redirected. . . . [Also, she] recently wrote the word 'sex' on the bottom of her foot. When asked about this, [the minor] said, 'I just keep thinking about it.' " She began individual therapy with Amy Votta-Fierro, LCSW, in May 2013. Votta-Fierro indicated that the minor demonstrated symptoms of PTSD. In January 2014, the minor changed therapists and began seeing Sally Huerta, MFTI. It was reported that although Huerta and Mother's therapist were looking forward to conjoint therapy, "it appears that this is not a therapeutically safe time for [the minor] to move to this step, as she still expresses a lot of fears surrounding the night of the last domestic dispute and continues to blame her mother for the demise of her father." The minor also began working with another therapist in August 2013 to develop healthy coping skills. That therapist reported she had seen progress in this regard.

Mother and the minor were participating in four hours of supervised visitation per week. It was reported that the minor enjoyed the visits with her Mother, and greeted her with hugs and smiles. Mother came prepared with age-appropriate materials. Hill noted that Mother "struggle[d] to consistently demonstrate her ability to follow a set structure for visits" by first helping the minor with homework before proceeding with play activities. Mother also "struggle[d] to follow and read [the minor's] cues appropriately." The social worker noted that another concern during the visits was Mother's discussion with the minor about Father's death. Although Mother was asked not to raise the subject outside of therapy, she did so with the minor in December 2013, and in February 2014.

Concern was expressed by the Department about Mother's judgment in making safe choices for the minor, noting that in March 2014, she and her friends had collaborated on a web-based fundraiser seeking contributions to assist Mother and the minor so that they could " 'have their own home and vehicle again.' " The solicitation, which contained multiple photographs of the minor—some taken in the Department's visitation room—was posted on public websites such as Facebook and Gofundme.com. Hill indicated that "the story portrayed by the website [was] misleading." It was reported the website had received donations of $475.

The Department summarized: "[The] seven-year-old [minor] has been exposed to a life of chaos, instability, and fear due to parental domestic violence and substance abuse. . . . [The minor's] current display of challenging behaviors is both concerning and understandable, given that the example of communication set by her parents was filled with violence and anger. [The minor] has shared with multiple people that, from her perspective, her mother killed her father, so it is no surprise that fear of her mother's anger and physical aggression continues to plague [the minor's] thoughts. For a period of time, it appeared as though [the minor's] negative behaviors were stabilizing and she was able to access healthy coping skills; however, more recently, it appears that these behaviors are resurfacing and are expanding to other settings. [The minor] has shared

that she believes she will be going home soon; she has displayed signs (vomiting and urinating in her pants) of increased anxiety within the past 4-6 weeks, which coincides with the increasing of visitation between her and her mother." It was also noted in the report that the minor had stated that she wanted to live with Mother, "but expresse[d] fear about the mother breaking items and hitting her." The report continued: "[Mother] has used this period of time to focus on reunifying with her daughter. . . . [S]he has made progress in maintaining a sober lifestyle and understanding the developmental needs of her daughter. Despite this, [Mother] has not made significant progress regarding other concerns that led to this dependency. A major contribution to the dependency was the mother's violent communication style, as at the core of domestic violence is challenged communication that is tainted by an unhealthy need for power and control. . . . In this case, [Mother's] need to fulfill her own desires, despite the needs of others, continues to be a common theme." Hill cited four examples of this behavior during Mother's visitation with the minor.

The Department concluded that Mother had "not demonstrated significant progress in her ability to meet [the minor's] needs. . . . [Mother's] poor judgment can be seen in the production of the website and in her discussion of [Father's] death during visits . . . . [Mother's] frequent housing changes due to interpersonal conflict is also concerning, as her continued difficulty in forming healthy interpersonal relationships does not lend to [the minor's] need to have a parent who can demonstrate healthy communication skills. In addition, [the minor] needs structure and stable housing and, as of the writing of this report, [Mother] does not have suitable housing for herself and her daughter." The Department ultimately concluded that return of the minor to Mother's physical custody would create a substantial risk of detriment to the minor's safety, protection, or physical or emotional well-being because (1) Mother continued to show behavior indicating that she was unable to follow the minor's verbal and behavioral cues; (2) Mother's behavior showed poor decisionmaking skills; (3) Mother "continues to

struggle in building healthy interpersonal skills"; (4) Mother had not yet obtained appropriate housing; and (5) the therapists had not been able to commence joint therapy between the minor and Mother because the minor was not therapeutically ready. The Department recommended that reunification services be terminated because there was not a substantial probability that the minor would be returned and safely maintained in Mother's physical custody by September 2014, which date would mark the eighteenth month since the minor's initial removal.

B.    Department's Addendum to Status Report

On June 17, 2014, the Department filed an addendum to its status report. It noted that the minor had completed first grade, and her academic scores were average to proficient in all subjects. Problems were identified, however, with the minor's ability to develop healthy relationships, to respect others' space and feelings, and to focus on assigned tasks. There was also continued concern expressed for the minor's actions of "wandering away from school and being in unauthorized locations." Hill indicated that the minor said "she would like to return to her mother 'as long as she [Mother] does not hit and yell at her.' When asked about how she would feel if she were not able to return to the custody of her mother, [the minor] stated[,] 'I would be so happy!' She also reported that 'as long as I can talk to her [Mother] on the telephone and maybe Skype, I will be okay.' While [the minor] may not understand the totality of not being raised by her mother, it is notable that the thought of not reunifying with her mother did not elicit a negative response."

It was also reported that on May 27, 2014, Mother had begun work as a telemarketer and was working 16 to 20 hours per week. Mother did not have stable housing, as she continued to house-sit for an acquaintance of her sponsor. The composition of her household and the anticipated length of time of her continued residency were unknown.

24

On her own initiative, Mother had enrolled in and completed another parenting course, Circle of Security. Mother reported that she had increased her knowledge of reading the minor's cues and of being more attuned to her needs.

The Department noted that Mother still had difficulty reading her daughter's cues, to respond in an appropriate fashion, and to put the minor's interests before her own. Hill also experienced difficulty with Mother not answering her phone, causing the social worker to conclude that Mother "appear[ed] to only want to engage on her schedule and at her convenience." Mother had contacted the Department several times to try to move the minor's psychiatry appointments because they conflicted with their visitation time. The Department discussed the issue with Mother and informed her, among other things, that (1) the psychiatry appointments were important because the minor was receiving psychotropic medication that required oversight; (2) Mother had been afforded the opportunity to participate in the appointments; (3) Mother should not view the appointments as infringing on her visitation rights, but rather as an opportunity to give input regarding the minor's health; (4)attending visits to physicians are a parental duty and may help with bonding; (5) the minor had not indicated any difficulty with having a portion of the two-hour visit, one time per month, located in a different setting; and (6) consolidation of the trips seemed appropriate. Hill indicated that "[d]espite this, [Mother] was still unable to see how her request was focused more on her own desires versus the needs of her daughter." It was also noted that after school ended for the year and the psychiatry appointment was, at Mother's request, set before the visitation time, Mother failed to show up for the appointment, saying "that she 'totally spaced it,' as she [was] adjusting to part-time employment."

The Department concluded it "remain[ed] concerned that [Mother's] inability to see beyond her own needs inhibits her ability to meet the needs of her daughter. . . . [The minor's] exposure to adults who demonstrated clear boundaries, appropriate communication skills, and healthy relationships was extremely limited. As such, [the

25

minor] struggles in these very same areas. At this stage of development, [the minor] should be able to engage in reciprocal and respectful play that lends itself to the establishment of developmentally appropriate peer connections. However, this is not the case, and in the assessment of [Hill] and the minor's therapist, in order to meet her needs in this area, [the minor] needs to be in the care of someone who can model this behavior in order to set the stage for healthy development. Given [Mother's] demonstrated inability to put the needs of others, including her daughter, before her own, and her misread[ing] of [the minor's] cues, she is not able to meet [the minor's] needs in this realm. [¶] Additionally, because [the minor] displays indiscriminate boundaries with others, it is critical that [the minor's] caregiver be able to establish clear boundaries with others, as the absence of this could lead to unsafe circumstances for the minor. [Mother's] skewed perception, disproportionate response, and inappropriate boundaries contribute to her inability to meet [the minor's] needs in this area." The Department acknowledged Mother's progress, including maintaining sobriety, and that there was a connection between her and the minor. But it indicated that Mother was not able to assume full-time parental duties and it was apparent that she would be unable to reunify with the minor, given additional time.

C.    Treatment Update

A treatment update prepared by two clinicians, Huerta and Ellis, of the Children's Behavioral Health unit of the Monterey County Department of Health, was filed on April 21, 2014. The minor was reported as having been in the same foster home for a year and, after having "experienced some normal adjustment and behavioral problems due in large part to her trauma history, . . . [had] done well and stabilized, overall." She initially had angry outbursts, threw objects, hit, slapped, squeezed, and yelled at others in the home, and she had some sexualized behaviors, including talking about sexual matters with the foster children.

26

The minor started receiving individual therapy in May 2013. At the request of the foster parents, she started therapy with a new clinician (Huerta) in January 2014. She was slow initially in trusting and sharing her experiences, but she had alluded to the violence in her home and reported she was scared and it was difficult for her to stop having these thoughts. The minor had indicated she missed Father, and she often shared memories of him. She was reported to be continuing to process trauma from her past, to grieve the loss of Father, and to acclimate to her new living environment.

The minor exhibited many PTSD symptoms; therapy was designed to continue to focus on reducing them. The minor was reported to be a delightful, bright, exuberant, verbal, and creative child. Pursuant to court authorization, the minor began taking a prescription for a psychotropic medicine, Fluoxetine, in January 2014.

The report reviewed the two psychological evaluations of Mother. It was indicated that in February 2014, Mother had received a medication evaluation for depression from a psychiatrist and it was determined that no medicinal intervention was needed. Mother's first therapy session occurred in November 2013. In the initial sessions, Mother "described herself and her mother in [an] inflated fashion, told different stories about hers and her mother's academic accomplishments and at a later time recanted her stories and said that 'I was thinking with my alcoholic brain.' " She initially minimized her alcoholism, but later began addressing it more seriously. Similarly, Mother initially downplayed the severity of her domestic violence and blamed Father as having been the aggressor, despite evidence to the contrary. It was reported that Mother more recently was "able to talk openly and honestly about the severity of her drinking, and the domestic violence . . . . [She] takes full responsibility for the unhealthy environment she had created for her daughter." She "expressed feeling 'terribly guilty' about what she calls 'that night' [in January 2013] and the images her daughter will carry with her."

In the treatment update, it was recommended that the minor and Mother both continue with weekly individual therapy sessions. It was also recommended that Mother continue to have supervised visitation of the minor at the Department's discretion, and that the two of them participate in conjoint therapy sessions.

D. Packets Submitted on Mother's Behalf

Mother's counsel filed separate packets of materials on April 21 and June 19, 2014. The first packet included eight letters of support from individuals and a letter from Mother (all discussed below). There were miscellaneous documents also contained in the two packets, namely, (1) copies of sign-up pages for AA meetings, showing Mother's regular attendance from April 22, 2013 to June 14, 2014; (2) a letter from the Stowitts Museum and Library in Carmel dated April 14, 2014, indicating that Mother had been employed as an archivist since October 2013; (3) records indicating Mother's receipt from Stowitts of an average monthly salary of $60; (4) a letter from Community Service Projects of the Central Coast dated June 6, 2014, indicating Mother's current employment in the sales department, working four hours a day, four days per week; (5) a March 2006 letter of recommendation concerning Mother's prior employment as a receptionist with California State University Monterey Bay; (6) copies of Mother's 2003 Associate of Science degree and certificates of completion of four medical courses; (7) a journal of Mother's appointments; (8) a letter from Door to Hope dated June 13, 2014, indicating Mother's attendance at aftercare sessions; (9) photographs of the minor and Mother; (10) notes from a grief counseling course; (11) letters from Pueblo del Mar indicating its consideration of Mother for residency; (12) a letter dated April 17, 2014, from two individuals indicating that they had prepared the fundraising page created for Mother to obtain housing for her and the minor, which was voluntarily removed from the site after privacy concerns were raised by the Department, and further indicating that Mother was kind, hardworking, and honest and would not place her child at risk; (13) a letter dated April 17, 2014, indicating that Mother had nearly completed her 52-week domestic

violence course and that she had been "working very hard and seem[ed] determined to be a better mother and all around person"; (14) an undated letter from Mother's probation officer indicating that Mother had complied with the terms and conditions of her probation, had completed the Door to Hope program, and had attended 47 of 52 domestic violence courses; (15) a County Probation Department progress report indicating favorable participation in domestic violence classes; (16) certificates of completion of the Triple P parenting education course, the Parent Education Group course, and the Parenting with Love and Logic course; and (17) a parenting workbook.

In the first of eight letters in the packet filed April 21, 2014, Mother's childhood friend stated that he had only known Mother to be a kind and giving person. He indicated that he hoped she could be reunited with her child, and that Mother had "been working her entire time on Court orders [in] the hope of getting [the minor] back." Second, Mother's sponsor wrote that Mother had achieved one year of sobriety; had been attending eight to ten AA meetings per week; had been serving as secretary for several regular meetings; was working on Step 9 of the 12-Step program; and "ha[d] made tremendous gains in her personal growth and recovery." Third, a Door to Hope counselor indicated that Mother had been attending aftercare regularly and had "maintained sobriety since her graduation." Fourth, a grief counselor stated that Mother had been attending nearly weekly sessions for five months, and the counselor had been "impressed by her thoughtful attention to the restoration of her own health and her willingness to build an entirely new future, free of addiction and failures." Fifth, another counselor, who had been acquainted with Mother for approximately one year, described Mother as conscientious, "a great listener and friend," and a person who had "done extensive work on herself, [and had] actively [sought] out on her own, three different therapists/specialists for working on her own issues of grief counseling and battered woman's syndrome." The counselor stated that Mother had "come a long way in her recovery, therapy, and ha[d] learned from her mistakes." Sixth, a Methodist minister

29

indicated that he had become acquainted with Mother through her regular attendance at 12-Step meetings held at the First United Methodist church in Salinas. He stated: "She has followed all rules and guidelines and has grown to be a welcome participant in our activities"; he "had no reason to be concerned about her ability to interact with others successfully"; and he had not "observed any behavior or activities that bring worry or concern." Seventh, a professor emeritus from Hartnell College, who had met Mother at the First United Methodist church in Salinas, stated that he had helped find Mother emergency housing and had later counseled her about developing healthy parenting skills and other issues. He said that Mother had actively sought employment, had undertaken to assume the role of a responsible parent, and had indicated that she would do whatever was necessary to regain custody of the minor. And eighth, a Door to Hope worker (writing a year earlier in April 2013) stated she had been impressed by Mother's level of honesty in recognizing her alcoholism when she had applied for inpatient care.

Mother wrote she had missed only one visit with the minor, and that absence had been due to an unavoidable scheduling conflict with an orientation meeting at Pueblo del Mar. She stated all of her visits with the minor had been very positive. Mother indicated she had found adequate housing for herself and the minor. She wrote that on her own initiative, she had taken a parenting class; had read a book about trauma and parenting; had asked questions about parenting at a domestic violence course she had attended for one year; had had parent mentors; and had maintained four on-call jobs as well as a regular part-time job. Mother noted she had acted as secretary for three weekly AA meetings; had maintained sobriety for one year; had maintained a sponsor; and had attended AA meetings approximately daily.[4] Mother stated further that she was excited

_____

[4] Based upon the sign-up cards Mother submitted, her claim of daily attendance was corroborated for only three of the 14 months of her attendance at AA meetings: She attended 29 meetings in May 2013, 33 meetings in March 2014, and 15 meetings in the partial month reported from June 1 to June 14, 2014.

to begin a 28-week Circle of Security class to assist her in "better read[ing her] daughter's cues and to understand child self-regulation and comfort." Mother also requested continued individual therapy as well as commencement of conjoint therapy.

E.     Testimony

In addition to the submission of the above-referenced reports and other materials, the court heard testimony from four witnesses.

1.     *Rachel Elis*

Rachel Elis, a psychiatric social worker employed by Children's Behavioral Health, is Mother's therapist and sees her weekly. Elis's first case contact with the social worker was on October 10, 2013, and the first therapy session with Mother was on November 4, 2013. Although Mother began individual therapy sessions with Elis in November 2013, it was not until April 2014 that Mother began fully participating in the sessions by "bec[oming] much more open" in discussing serious behavioral issues. Elis testified that Mother had become more honest with herself than she was earlier in therapy. She had observed that Mother, since April 2014, had "acknowledged [the minor's] trauma" and her role in causing it. Elis stated that she would have expected Mother, in the time she had been receiving therapy, to have made more progress. As an additional point showing lack of progress in reunification, Elis emphasized that Mother was "still hav[ing] supervised visits after more than a year."

Based upon her therapy sessions, Elis concurred with the diagnosis of Dr. Lee and Dr. Finnberg that Mother had a narcissistic personality disorder. This disorder manifests itself by, among other things, a tendency to exaggerate personal achievement and ideas. One example provided by Elis was Mother's stating that she had gone to medical school. On follow-up from Elis—and after approximately five months had passed in which the subject had been repeated—Mother admitted that she had taken classes in medical office management, and had not gone to medical school.

In Elis's opinion, Mother did not at the time of the hearing have the ability to establish good and healthy boundaries. The therapist defined "[h]ealthy boundaries" in this context as "know[ing] how to take care of your child and relate to the child on the child's term[s], without putting your needs first." She cited as an example Mother's creation of a website to seek contributions, using the minor's photographs, and "[t]elling a story about [the minor] losing her home." She stated that Mother's ability to form appropriate relationships was questionable, but that upon gaining sobriety, Mother had started looking at past relationships that were unhealthy. Mother reported to her therapist that she had a good relationship with her sponsor and with people in her AA community.

Elis also opined that Mother did not at the time of the hearing have the capability of taking care of the minor's physical and emotional needs, and it was questionable whether Mother would be able to keep the minor safe. And she opined that, were the court to extend reunification services to 18 months, Mother would not be able to meet the minor's needs at the end of that time: "I think it's not enough time. I think that people that have a personality disorder need to go . . . through a long therapeutic process, that takes three, four, five years."

Pursuant to the court's request, Elis also participated in two conjoint therapy sessions in May 2014 with Mother, the minor, and the minor's therapist, Huerta. Based upon the two conjoint sessions, Elis formed the opinion that Mother and the minor had "a strong bond and they do love each other." She qualified this statement by indicating that their strong attachment was not sufficient to keep the minor safe.

### 2. *Tameka Hill*

Tameka Hill is the Department social worker who had handled the case since July 2013. She testified that there was a Department guideline that caseworkers meet with parents in person at least once a month. Hill indicated she had done that with Mother "[f]or the most part." Counsel stipulated that not every visit between Mother and Hill had been face-to-face.

32

Mother's visitation with the minor had initially been weekly and had increased over time to three times per week. Hill testified that Mother's visits with the minor were still on a supervised basis because there were concerns about Mother (1) talking about inappropriate things during visitation, and (2) properly reading the minor's cues and "respond[ing] to them proportionately." There had been two visits—in December 2013 and February 2014—in which Mother had raised the subject of Father's death with the minor. Mother had done so, despite the Department's having advised her several times in team meetings not to discuss the subject with the minor except in a therapeutic setting.

Hill testified concerning visitation between Mother and the minor over the last review period (i.e., September 2013 to June 2014). Mother and the minor had looked forward to the visits and had greeted each other with smiles. Elis believed there was a strong attachment between Mother and her daughter. The social worker had not observed Mother becoming angry with, or yelling at, her daughter. Mother had struggled initially with bringing things that were age appropriate to the visits. Hill's major concern was still "[Mother's] ability to maintain safe boundaries in topic[s] of conversation with [the minor]." Hill was also concerned about Mother's ability to read the minor's cues. She described an instance early in the year in which, after the visit, Mother telephoned Hill and was very upset about the minor's behavior, saying "[t]hat she could hardly hold on to a fork. That she almost collapsed during [the] visit." Hill checked with people who were involved during the visitation, and no one corroborated Mother's version of what had transpired. Hill summarized: "[T]he visits or activities go well. They enjoy one another. However, the application of some of the tools that mom has learned has been challenged."

The minor's anxiety level had increased as the frequency of visits with Mother had increased. There was an incident at school in which the minor had "wet her pants. There was also some vomiting going on." Hill testified that increased anxiety was common when children increase their visits with their parents. "For [the minor], what has been

33

reported from various sources is that there is some nervousness. Because she interprets increased visitation and participation in conjoint therapy as, she is going to be going home. And she will verbalize that that makes her nervous." Hill also testified the minor had repeatedly said that she wanted to be with Mother.

Hill said that while Mother had participated in the Door to Hope residency program, her "interpersonal relationships were very challenged." She had had problems with conflict resolution with her roommates and had not been forthright about where she was going when she left on a pass. These issues resulted in her being placed under a behavioral contract under which further violations would result in her being expelled from the program. Hill opined that this was "just another indication of [M]other's inability to build healthy interpersonal relationships."

Hill also testified about the website that Mother had created concerning the minor to solicit funds for housing and a car. There were a number of photographs of the minor, including two taken at the Department's offices. Hill testified the website was problematic because it was manipulative in skewing the information it provided. She opined that Mother's sponsoring of the website had shown poor judgment because it had violated the minor's privacy—where the minor was already extremely vulnerable—by placing multiple pictures of the minor and her entire story on the Internet on multiple sites.

In Hill's opinion, Mother had regularly participated in the treatment plan and had made progress with her sobriety. But Mother, Hill opined, had not made substantive progress in the treatment plan. Although she had made progress with her sobriety, she had not made progress to the point where she could safely parent the minor. Hill explained that, notwithstanding the services Mother had received (therapy, domestic violence courses, parenting courses, the Door to Hope class), there were issues remaining with respect to her "being able to look at her own mental health, being able to read her daughter's cues, being able to develop healthy interpersonal skills, . . . which is at the

34

core of domestic violence." In Hill's opinion, there was not a substantial probability that, if services were continued, she would recommend at 18 months that the minor be returned to Mother's care, because it was unlikely Mother would be able to safely care for the minor by that time.

### 3. *Norma Luquin*

Norma Luquin works for the Department and supervises family visits. She had supervised approximately 16 to 20 visits between Mother and the minor. Luquin testified that Mother and the minor were happy to see each other during the visits and hugged each other at times. Luquin had observed Mother helping the minor with homework; showing her how to cut fruit; reading to the minor; and praising her.

### 4. *Mother*

Mother testified that she was first contacted by Social Services when she was in jail. At the time, her mental state was "very fuzzy." She was having anxiety attacks; her husband had died; the minor had been taken from her; she had lost her home and cars; and she "was still coming off of alcohol." Mother testified that as of the hearing date, she had been sober for almost 15 months. She had attended AA meetings usually once or twice daily, and had acted as a secretary in facilitating a number of the meetings. At the time of the hearing, she was on Step 8 of the 12-Step program. Mother also, on her own initiative, had sought free counseling from a rape crisis center because she had been on the waiting list for counseling from Behavioral Health and had needed help dealing with grief associated with Father's death and her separation from the minor.

Mother had tried, and had asked, to meet with Hill once a month. In the six months before the hearing, they had met four times face-to-face. The meetings had ranged from 45 minutes to two hours. On occasions when Hill had been late, the time of the meeting had not been extended.

Mother said she was a different person from the one who had been in jail in March 2013. Mother stated she was stronger, and that being sober had given her clarity

35

and the ability to make better choices.  Her four-month stay at Door to Hope had taught her that her "interpersonal relationships . . . were poor" and she had tried to make changes to address that issue.[5]  Mother testified she had been working on "repairing ruptured relationships."  She had maintained contact with a number of the women she had met at Door to Hope.

From her attendance at the Triple P parenting class, Mother had learned to create a chore schedule for her daughter and to try to place herself in the minor's shoes to understand what she might be feeling.  From the Parenting with Love and Logic course for which she had volunteered, Mother had learned the importance of teaching young children "the power of responsibility."  Mother had also completed the Circle of Security class.  She had learned "to repair ruptured relationships" and had been given confidence that she might be able to repair her relationship with the minor.  Her attendance at domestic violence classes—which she completed  about three weeks before the hearing— had helped Mother to discuss and understand her relationship with her late husband and had taught her to be more self-sufficient.

Mother testified she was not in a home that could accommodate the minor.  She had gone through orientation at Pueblo del Mar but understood that to be eligible for housing, she needed a letter from the Department indicating that her child would be returning to live with her within 45 days.  She was also on the waiting list for low-income housing.

Mother was working at Community Services in a part-time, minimum wage, telemarketing job.  She was also an on-call archivist for the Stowitts Museum and Library, and she maintained an online boutique in which she sold used women's and children's clothing and shoes.

---

[5] Mother's testimony was interrupted at this point because she appeared to be reading from her notes rather than giving testimony.  The court admonished her that it wanted to hear her testimony rather than have her read from her notes.

Mother admitted she had been involved in domestic violence with her late husband, but testified that she had never struck the minor. Mother's view about violence at the time of the hearing was that she did not want it in her life or in the minor's life anymore. She explained that when she had been drunk, she had not made the right choices; had not been in control; had been fighting back; and had been mean. Mother testified she had not initiated any violence since becoming sober, and she felt that, "for the most part," she was now in control of herself, although she still grieved being separated from her daughter.

With respect to being aware of the minor's cues, Mother acknowledged she had made a mistake in chasing after the minor with little time left during one visit, when the minor had clearly wanted to do something else. Mother said she was trying to ask herself and Hill what she could do differently. Mother testified she "just really listen[s] to [the minor and] . . . let[s] her do the talking in [their] visits." She stated she was committed to continuing with individual therapy as well as conjoint therapy with her daughter.

F.    Order After Twelve-Month Review Hearing

After considering the reports, documents, and testimony, and after hearing argument from counsel, the court announced its decision from the bench. It adopted the findings and orders as recommended by the Department. The court found that Mother had made progress and had "been consistent with her participation in the case plan [and had been] consistent with her visits." But the court noted that "[t]he 800 pound gorilla in this case is the [Mother's] narcissistic personality disorder that's been diagnosed by [two qualified professionals]. And the elements of it have been observed by Rachel Elis [in] her therapeutic work with the mother." The court went on to conclude: "Fundamentally, what we're talking about here is the inability to feel and act upon empathy for others. And this is not a bad habit. This is a profound disruption of one's cognitive processes and one's . . . 'affective processes' as well. One's thinking, one's world view, one's feeling[s], inner thoughts. . . . [¶] Someone with this disorder cannot process

37

information, from the behavior and statements of other people, the way normal people do. . . . And they can't think clearly, because their thinking is delusional . . . . [¶] And this all puts [the minor] in an impossible situation. And I'm certainly not faulting the mother." Citing Dr. Lee's report, the court indicated it was highly unlikely the disorder would be treated successfully with therapy.

The court also noted that Mother was "highly functional[,] . . . intelligent[, and] . . . very capable. Unfortunately, she's capable of manipulation." And it observed that Mother "really got going in her therapy and in her case plan only when she saw the Department's recommendation to terminate services." It concluded that it did not see the possibility of "a happy outcome" in the case because Mother had not "fundamentally changed, because she can't."

At this point in the court's announcement of its decision, Mother interrupted the court, stating, "I don't have narcissism. That's bullshit." She then left the courtroom, but she returned shortly afterward and apologized to the court. The court concluded that as a result of Mother's personality disorder and the unlikely probability of her being able to successfully address it, there was "no substantial probability or possibility of this court ordering a return [of the minor] within the statutory time period."

There were a number of findings adopted by the court in its written order. It concluded that reasonable services were provided or offered to Mother; Mother had participated regularly in the court-ordered treatment programs; Mother's progress toward alleviating or mitigating the causes of the placement had been moderate; the return of the minor to Mother would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being; and there was not a substantial probability the minor would be returned to Mother's physical custody before the expiration of 18 months after the minor's initial removal. The court ordered that a section 366.26 selection and implementation hearing be scheduled for October 21, 2014, and that Mother's family reunification services be terminated.

38

*VIII.   Petition for Writ of Mandate*

Pursuant to rule 8.450(e) of the California Rules of Court,[6] Mother filed a timely a notice of intent to file a writ petition to review the order setting a hearing under section 366.26.  Thereafter, Mother filed her petition for writ of mandate with this court on July 21, 2014.  (See rule 8.452.)  Real party in interest Department filed its opposition on August 5, 2014.[7]

DISCUSSION

*I.   Applicable Legal Principles*

A.   Dependency Law Generally

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare.  [Citations.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  As the California Supreme Court has explained:  "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.  [Citations.]  The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.  [Citations.]  This interest is a compelling one. [Citation.]"  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

---

[6] All rule references hereafter are to the California Rules of Court.

[7] In its opposition, real party in interest Department erroneously designated itself as "respondent."  No opposition was filed on behalf of respondent superior court.

39

The court at the jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction. (§ 355, subd. (a).) Once such a finding has been made, the court, at a dispositional hearing, must hear evidence to decide the child's disposition, i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions. (§ 361, subd. (a).) If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and convincing evidence establishing that one of five statutory circumstances exists. (§ 361, subd. (c).) One such circumstance is the existence of substantial danger to the dependent child's "physical health, safety, protection, or physical or emotional well-being" if he or she were returned to the home. (§ 361, subd. (c)(1).) Two other circumstances are where the child "has been left without any provision for his or her support, or a parent who has been incarcerated or institutionalized cannot arrange for the care of the minor." (§ 361, subd. (c)(5).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing a permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

Prior to the permanency hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) "Review hearings are critical because they are the point at which a parent may be denied further reunification services. [Citation.]" (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61.) Where there is an order placing the dependent child outside of the home, the status

40

review and permanency hearings are governed by the provisions of section 366.21 and 366.22.

At the six-month review hearing, the court is required to return the child to the home of his or her parent, unless it finds, by a preponderance of the evidence, that such return would result in a substantial risk of detriment to the child's safety, protection or well-being (physical or emotional). (§ 366.21, subd. (e).) The 12-month permanency hearing has the same requirement that the child be returned to the home unless the court finds by a preponderance of the evidence that his or her return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21(f).)

At the 12-month permanency hearing, the same statutory presumption applicable at the six-month review hearing applies, namely, the court must return the child to the parent's home unless it finds by a preponderance of the evidence that such return would result in a substantial risk of detriment to the child's safety, protection or well-being (physical or emotional). (§ 366.21(f); see also *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 306 (*Bridget A.*).) If the court does not return the child to the parent at the 12-month permanency hearing and makes the requisite "substantial risk of detriment" finding, it has four options under the statute, two of which are relevant here. (§ 366.21, subd. (g) (hereafter, § 366.21(g)).) One option is for the court to continue the matter for a permanency review hearing, with the continued hearing scheduled no more than six months later or not more than 18 months after the child's original removal. (§ 366.21(g)(1).) It may do so only if the court finds there is a substantial probability the child will be returned and safely maintained in the parent's custody within that time frame, or, alternatively, that reasonable services have not been provided to the parent. (*Ibid.*; see also *Bridget A.*, at p. 306; cf. *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 181-182, fn. 6 [court has no discretion at "12-month hearing to simply punt to the 18-month review"; unless it finds facts showing probability child will

41

safely reunite with parent within 18 months of initial removal, court must set a .26 hearing].)

A second option at the 12-month hearing, if the child is not returned to the parent's home, is for the court to order that a selection and implementation hearing under section 366.26 be held within 120 days. (§ 366.21(g)(4).) The court may so act only if it finds (a) there is no substantial probability the child will return to the parent and be safely maintained in the home within 18 months after the child's initial removal; and (b) by clear and convincing evidence, that reasonable services were offered or provided to the parent. (*Ibid.*; see also *Bridget A.*, *supra*, 148 Cal.App.4th 285 at p. 306.) If this second option of setting a .26 hearing is ordered by the court, it must terminate reunification services, but the parent will continue to have visitation unless there is a finding that such visits would be detrimental to the child. (§ 366.21, subd. (h).)

B.     Family Reunification Services

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A.*, *supra*, 148 Cal.App.4th at p. 303.) As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.] But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Where reunification services are ordered, they generally (subject to exceptions and instances in which the period may be extended) begin with the dispositional hearing and, for children three years or older, end 12 months thereafter. (§ 361.5, subd. (a)(1)(A).) Although a parent may reasonably expect under most circumstances to receive reunification services for at least the periods designated under section 361.5, subdivision

(a)(1), there is no entitlement to services for a prescribed minimum period. (*In re Derrick S.* (2007) 156 Cal.App.4th 436, 445-450 [parent of child over three not entitled to minimum of 12 months of services].) Thus, "the juvenile court has the discretion to terminate the reunification services of a parent at any time after it has ordered them, depending on the circumstances presented." (*In re Aryanna C.*, *supra*, 132 Cal.App.4th at p. 1242.)

### C. Standard of Review

Our review of an order terminating reunification services and setting a .26 hearing is governed by the substantial evidence standard. As we will discuss below, Mother challenges the order to the extent the court found (1) there was no substantial probability the minor would be returned to Mother and be safely maintained in the home within 18 months of the child's initial removal; and (2) that reasonable reunification services were provided or offered by the Department to Mother. We review both of these findings by the trial court to determine whether there is substantial evidence to support them. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-692 (*Kevin R.*); *Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625-626.)

Our task in reviewing the decision of the juvenile court for sufficiency of the evidence is governed by rules applicable to appeals generally. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333.) "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citations.] The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*Id.* at pp. 1333-1334; see also *Kevin R.*, *supra*, 191 Cal.App.4th at pp. 688-689.) If there is substantial evidence shown in support of the

43

trial court's determination, " '[i]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 331, quoting *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

The trial court's finding that reasonable services were provided by the Department must be based upon clear and convincing evidence. (*In re Monica C.* (1994) 31 Cal.App.4th 296, 304.) But " ' "[t]he sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoting *Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

*II. Order Setting .26 Hearing and Terminating Family Unification Services*

Mother contends the court erred in its order terminating reunification services and setting a .26 hearing. She asserts the court's findings in support of the order are not supported by substantial evidence because they "are contrary to the mother's substantial progress while engaged in reunification services." (Capitalization omitted.) Mother contrasts the significant differences temporally in her attitude, sobriety, willingness to acknowledge responsibility, and level of cooperation between the beginning of the dependency versus at the time of the 12-month permanency hearing. She asserts there was no substantial evidence to support the court's conclusion that "[M]other was only doing well because she was manipulative and intelligent enough to know what the [D]epartment and the court wanted and acted accordingly with reference to her participation in her case plan." And she argues that she did not receive reasonable reunification services because there was a claimed seven-month delay in her receiving individual therapy. Finally, she contends that extension of reunification services was warranted because she made significant progress in addressing her substance abuse issues

44

and with her case plan overall, and because she was not offered reasonable reunification services.

Before addressing Mother's contentions, we first reiterate the framework for our review of the trial court's order. If the court at the 12-month permanency review hearing does not return the child to the parent, it must find by a preponderance of the evidence that such return would result in a substantial risk of detriment to the child's safety, protection or well-being (physical or emotional). (§ 366.21(f); see also *Bridget A.*, *supra*, 148 Cal.App.4th at p. 306.) If it does not find a factual basis for continuing the permanency hearing for six more months (but for not more than 18 months after the child's initial removal) under section 366.21(g)(1), the court then sets a section .26 selection and implementation hearing and terminates reunification services. In setting a .26 hearing, the court must find (1) there is no substantial probability that the child will return to the parent within 18 months after the child's initial removal, and (2) by clear and convincing evidence, that reasonable services were offered or provided to the parent. (§ 366.21(g)(4); see also *Bridget A.*, at p. 306.) We apply the substantial evidence review standard to both of these findings. (*Kevin R.*, *supra*, 191 Cal.App.4th at pp. 688-692.)

Mother does not challenge the court's initial finding that the minor should not be returned to her because such return would result in a substantial risk of detriment to the minor's safety, protection, or physical or emotional well-being. Indeed, at the permanency hearing, Mother testified she was not then living in a home that could accommodate the minor. We therefore need not address this issue, since Mother has forfeited any challenge to this finding. We will therefore consider whether there was substantial evidence supporting the court's findings that (1) there was no substantial probability the child would return to the parent within 18 months after the child's initial removal; and (2) by clear and convincing evidence, reasonable services were offered or provided to the parent.

A.    Substantial Probability of Child's Return to Home

The court set a .26 hearing and thereby elected not to continue the permanency planning hearing.  (§ 366.21(g)(4).)  It thus found the *absence of* the criterion for continuing the permanency hearing under section 366.21(g)(1)—that "there is a substantial probability that the [minor] will be returned to the physical custody of [Mother] and safely maintained in the home within" 18 months of the minor's initial removal.  In reviewing the court's finding for substantial evidence, we note there are three mandatory factors enunciated by the Legislature under section 366.21(g)(1) that a court must conclude in favor of the parent in order to extend the reunification period, namely, that the parent: "(A) . . . has consistently and regularly contacted and visited with the child.  [¶] (B) . . . has made significant progress in resolving problems that led to the child's removal from the home.  [¶ and] (C) . . . has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  Each of these factors must be resolved in favor of the parent to continue the permanency review hearing and the parent's reunification services.  (*Ibid.*)  Stated otherwise in the context of this case, if there is substantial evidence supporting the trial court's conclusion that *any one of* the three factors does not favor Mother, we must uphold the court's conclusion that there was not a substantial probability that the minor would safely return to Mother's custody within 18 months of her initial removal.

There is no dispute that the first factor—that Mother "has consistently and regularly contacted and visited with the child" (§ 366.21(g)(1)(A))—was shown.  But there was substantial evidence supporting the trial court's findings that the two other factors were not established and that the permanency hearing could therefore not be continued.

We consider the second and third factors together.  There was evidence supportive of Mother's position as to these factors.  The court itself acknowledged that Mother had

46

been consistent with her case plan and that Mother had "made progress." But the fact that Mother had "made progress" must be distinguished from Mother's having "made *significant* progress *in resolving problems* that led to the child's removal from the home." (§ 366.21(g)(1)(B), italics added.) And while Mother may have shown the capacity and ability to accomplish the tasks required of her under the case plan, this does not mean that she showed the capacity and ability (1) "to complete *the objectives of* [the] treatment plan," and (2) "to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21(g)(1)(C), italics added.)

There was much evidence showing that Mother's efforts were indeed commendable. Mother had made significant progress in addressing her alcohol abuse, a problem that was, according to Dr. Donahue, Dr. Lee, and Dr. Finnberg, a significant contributing cause of Mother's violent behavior in the home. Mother had successfully completed a residential treatment program and had attended aftercare sessions; had maintained her sobriety for 15 months; had regularly attended AA/NA meetings and had volunteered to act as secretary for a number of those meetings; had maintained contact with her sponsor and had worked on the 12-Step program; had completed the 52-week domestic violence class required as a term of her probation; had regularly attended sessions with her therapist, Elis; had completed a Triple P parenting class as well as two additional parenting classes she voluntarily attended; had sought and obtained part-time employment; had sought stable housing through Pueblo del Mar; had consistently visited with the minor; and had a close bond with her daughter. There was also evidence that Mother had taken responsibility for her violence and that more recent therapy sessions with Elis (since April 2014) had been more productive.

But there was also substantial evidence that Mother (1) had not made significant progress in resolving the problems that originally led to the dependency; and (2) had not demonstrated she had the capacity and ability to provide for the minor's safety, protection, physical and emotional well-being, and special needs. Mother's mental

47

health, domestic violence, and alcohol dependency issues at the root of the dependency were not isolated to the single January 2013 incident that resulted in her arrest and conviction. As we have noted, there were several referrals prior to the March 2013 referral that resulted in the minor's detention. In August 2010, after throwing a glass at Father while she was drinking, Mother was placed in an involuntary psychiatric hold. In June 2012, Mother was arrested after physically assaulting Father—in the minor's presence—by throwing a wastebasket at his head, attempting to strike him with multiple bottles, biting him, and punching him multiple times. And the significance of the violent and bloody incident in January 2013 in which Father was severely cut after Mother broke a bottle on his person—also witnessed by the six-year-old minor who had thought at the time that Father was going to be killed—cannot be understated.

Social worker Hill testified that, despite improvement by Mother, there were still concerns about her talking about inappropriate things with the minor and with Mother's being able to read the minor's cues and respond to them properly. There were two instances in December 2013 and February 2014 in which Mother, despite being warned multiple times by the Department, had raised with the minor the subject of Father's death. Hill also described an incident in which Mother complained about the minor's near collapse during a visit in early 2014 that was uncorroborated by any witnesses to the visitation. Hill also identified Mother's involvement in creating a website to solicit donations for her and the minor; it showed a great lack of judgment, constituted a serious breach of the minor's privacy rights, and was manipulative and misleading in its presentation. And Hill opined that Mother had an "inability to build healthy interpersonal relationships," a problem that was "at the core of domestic violence." Hill accordingly concluded that while Mother had made progress with her sobriety, she had not made substantive progress in the treatment plan and it was unlikely Mother would be able to safely care for the minor by the 18-month mark.

Additionally, therapist Elis testified that although Mother started weekly therapy sessions with her in November 2013, it was not until April 2014 that Mother began fully participating in those sessions. Elis concurred with the two psychologists' diagnoses that Mother had a narcissistic personality disorder. Furthermore, Elis opined that Mother was unable to establish good and healthy boundaries for the minor and it was questionable whether Mother was able to form healthy relationships. Elis believed Mother did not have the capability of taking care of the minor's physical and emotional needs and it was questionable whether Mother could keep her child safe. Elis concluded that 18 months from the time of the minor's initial removal was "not enough time" for Mother to reach the level where she could meet the needs of the minor, emphasizing that a lengthy therapeutic process of three to five years is necessary for people with a personality disorder such as Mother's.

Moreover, both Dr. Lee and Dr. Finnberg concluded that Mother suffered from a severe narcissistic personality disorder. In Dr. Lee's words, this "severe personality disorder . . . interferes [with Mother's] ability to feel empathy for her daughter's distress"; she recommended denial of reunification services. And Dr. Finnberg observed that "[a] large majority" of people with narcissistic personality disorder were unable to benefit from psychotherapy.

Considering the entire record and drawing all reasonable inferences in support of the court's findings (see *In re Christopher L.*, *supra*, 143 Cal.App.4th at p. 1333), there was substantial evidence supporting the trial court's finding that Mother had not made significant progress in resolving problems that led to the minor's removal from the home. (See § 366.21(g)(1)(B).) Likewise, there was substantial evidence supporting the finding that Mother did not have the capacity and ability to complete the objectives of the treatment plan, or to provide for the minor's safety, protection, physical and emotional well-being, and special needs (See § 366.21(g)(1)(C).) Since affirmative answers to both of those findings were required to conclude there was "a substantial probability that the

49

[minor] will be returned to the physical custody of [Mother] and safely maintained in the home within" 18 months of the minor's initial removal (§ 366.21(g)(1)), the court did not err in reaching the contrary conclusion.

Mother argues the court erred because there was no substantial evidence to support its "observations that the mother was only doing well because she was manipulative and intelligent enough to know what the [D]epartment and the court wanted and acted accordingly with reference to her participation in her case plan." She reiterates the argument that the court's findings of "manipulation and false representation . . . are inferences . . . not based upon the evidence."

Her argument is without merit. First, the court did not directly state that Mother manipulated the system or misrepresented her motivations for attempting to comply with her case plan. The court indicated Mother was "very intelligent. She's very dedicated. She's very capable. Unfortunately, she's capable of manipulation, as well as she is of many other things." Second, even accepting Mother's premise, her implicit argument is that the court questioned her credibility. In reviewing the court's order for substantial evidence, we do not reweigh the evidence or assess the credibility of any of the witnesses; those are matters exclusively within the province of the juvenile court. (*In re Christopher L.*, *supra*, 143 Cal.App.4th at p. 1333.) Third, even were it true that the court based its finding that there was no substantial probability that the minor would be safely returned to Mother's custody within the 18-month period on the rationale, at least in part, that Mother had been manipulative, this would be of no consequence. In reviewing the court's ruling, we do not review the trial court's rationale; if there is substantial evidence supporting the decision, we will affirm. (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909 (*US Ecology*).)

*In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), relied on by Mother, arose out of a different procedural context and does not support Mother's position. In *Kimberly F.*, the youngest two of the mother's four children were removed from the

home and placed with their relatives when the mother's home was determined to be in an unsanitary and unsafe condition. (*Id.* at pp. 522-523.) Although home conditions improved to some extent, the court at the 18-month review hearing set a .26 hearing and terminated reunification services. (*Id.* at p. 524.) Five months later, and shortly before that .26 hearing, the mother filed a section 388 petition, in which she demonstrated she had been keeping her home in a safe and sanitary condition. (*Kimberly F.*, at p. 525.) The juvenile court denied the mother's petition, finding there had been no change in circumstances and that the proposed modification would not be in the minors' best interests. (*Id.* at p. 526.) The appellate court reversed the order. It concluded, among other things, that (1) the court erred in finding no change of circumstance, since the facts indisputably showed that the home was no longer in an unsafe and unsanitary condition, i.e., the initial reason for the dependency (*id.* at pp. 526-527); (2) the juvenile court improperly relied on a psychologist's descriptions of the mother's eccentricities that did not establish detriment (*id.* at p. 527); and (3) a determination of the best interests of the child could not be accomplished through a simple comparison between the parent's and the caretakers' respective households, but required consideration of a number of factors, including the seriousness of the initial reason for the dependency and the strength of the parent-child bond (*id.* at pp. 529-531).

*Kimberly F.* is factually a very different case. The appellate court in *Kimberly F.* assessed that the circumstances resulting in the dependency were not very serious, as compared with other cases. It stated that "even the most compulsive housekeeper would agree that a dirty house case generally lies at the other end of the continuum from sexual abuse and drug cases." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9.) Here, the reasons for the dependency—severe and recurrent domestic violence witnessed by the minor, chronic alcohol abuse, and the absence of any provision for the care of the minor as a result of Mother's incarceration and Father's death—were much more serious and profound than "a dirty house case."

Mother seizes on a passage of *Kimberly F.* concerning narcissism to argue that the court here erred in citing to her diagnosed narcissistic personality disorder in support of its order. The *Kimberly F.* court, in the context of finding that the juvenile court abused its discretion in denying the mother's section 388 petition where she had clearly shown changed circumstances, rejected any reliance upon the psychologist's "characterization of [the mother] as 'narcissistic,' 'self-centered' 'dolorous' and—of all things—'generally conservative.' " (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 527.) The appellate court observed that these characterizations were "at the absolute worst, literary descriptions of eccentricity, not tendencies to harm children. They cannot carry any weight in showing detriment. The government cannot remove children from their parents because a psychologist opines that a parent is 'narcissistic.' [Citation.] If narcissism could constitute a basis for dependency, the children of many able and important leaders, not only in politics but academia, the arts—and certainly law—would be subject to removal." (*Ibid.*) Here, unlike in *Kimberly F.*—where the psychologist merely described the mother as " 'narcissistic' " (*id.* at p. 523)—Mother was diagnosed by two psychologists as having a severe narcissistic personality disorder. Further, there is no suggestion here that the dependency was created due to Mother's suffering from that personality disorder or because anyone claimed she was narcissistic. Moreover, the court's citation of Mother's narcissistic personality disorder as one of its reasons for its decision—calling it "[t]he 800 pound gorilla"—does not alter our conclusion that substantial evidence supported the court's finding that it was not reasonably probable the minor would return safely to Mother's custody within the 18-month period. (See *US Ecology*, *supra*, 129 Cal.App.4th at p. 909 [appellate court does not review rationale if substantial evidence supports trial court's decision].)

In making the argument that the court improperly relied on Mother's personality disorder, Mother claims that the trial court "called [this] a close case." In fact, toward the completion of the announcement of its decision from the bench, the court stated that

52

"whether there is a substantial probability that these conditions are going to be fundamentally altered, so that there can be a return of the child within the time that remains, *that question is not even close*." (Italics added.)

Finding a parallel to our case, Mother further relies on *Kimberly F.* to the extent the juvenile court in that case, in terminating the mother's reunification services at the 18-month review hearing, found the mother's " 'narcissistic personality' " was a " 'problem . . . which would take many months or perhaps years to address.' " (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 524.) But the order terminating services at the 18-month review hearing was *not* the subject of the appeal in *Kimberly F.*; rather, it was the juvenile court's denial six months later of the mother's section 388 petition. Further, Mother claims the "court [here] used almost, if not the identical language of the juvenile court in *Kimberly F.*, that it would take 'months if not years' to address and resolve the narcissistic disorder." Mother does not include a citation to the record in support of this contention, and this court has searched the record in vain for such support. The closest language is the court's statement that one of the psychologists had stated that a person with a narcissistic personality disorder was "highly unlikely to be treated successfully with therapy." As noted earlier, Mother's therapist, Elis, testified that people with a personality disorder such as Mother's required three to five years of therapy. And the Department's counsel in closing argument cited to that testimony. But to the extent the court may have relied on the opinion that Mother's personality disorder was one that was resistant to therapy in reaching its conclusion that reunification services should be terminated, we do not review this rationale. (*US Ecology, supra*, 129 Cal.App.4th at p. 909.)

It is readily apparent from the record that the court considered the evidence comprehensively, including matters that were positive with respect to Mother's substantial work consistent with the case plan. The court nonetheless concluded there was not a substantial probability that the minor would be safely returned to Mother's

custody within the 18-month period. There was substantial evidence to support this conclusion.

### B. Provision of Reasonable Services

Mother contends the court below erred in finding by clear and convincing evidence that reasonable services were provided or offered by the Department. She argues that although reunification services were ordered in April 2013 at the jurisdiction/disposition hearing—and those services included therapy—there was a delay of seven months until she first met with her therapist, Elis, in November 2013. She contends this delay was through no fault of her own.

Mother's claim is forfeited. "[A] parent is prevented from challenging the reasonableness of services on appeal if the issue was not first brought to the attention of the juvenile court. [Citation.]" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1347-1348, fn. 5 (*Amanda H.*).) Mother submitted no argument below that the family services provided or offered by the Department were not reasonable. Despite being represented by counsel since the outset of the case in March 2013, Mother never asserted that the Department's efforts were deficient. For instance, there is no evidence that she raised the issue of the Department's alleged delay in providing her with a therapist at the six-month hearing on October 23, 2013. And the court made a finding at that time that reasonable services had been offered by the Department. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416: "If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan.") Mother at no time during the provision of services asserted the Department unreasonably delayed in providing her with therapy and that this delay constituted a denial of reasonable services. And no such argument was made by Mother in either her trial brief or at the permanency hearing. At best, in Mother's trial brief, there is a veiled reference to a delay in beginning therapy: "It bears mentioning that Rachel Ellis [*sic*] did

54

not begin therapy with the mother until October of 2013. The mother has made progress in therapy. Had therapy began [*sic*] earlier, the mother could have had additional time to confront and work through her issues."

Mother's contention, although forfeited, in any event has no merit. The adequacy of the Department's plan for reunification and the reasonableness of its efforts must be determined by the circumstances of the particular case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 (*Robin V.*).) The Department must make a good faith effort to design and implement the plan. (*Amanda H.*, *supra*, 166 Cal.App.4th at p. 1345.) But a good faith effort is not the equivalent of perfection: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Furthermore, "a parent [may not] wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing. [Citation.]" (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.) It is within this context that we review for substantial evidence the court's finding here by clear and convincing evidence that the Department offered or provided reasonable services to Mother. (See *Kevin R.*, *supra*, 191 Cal.App.4th at pp. 690-692.)

There is no claim that the Department's plan for reunification was inadequate. Substantial services were offered and provided by the Department. These services included individual therapy for the minor; individual therapy for Mother; conjoint therapy for the minor and Mother; regular visitation of the minor with Mother, initially weekly and later three times per week; regular plan meetings between Mother and Department staff; arrangement of psychological evaluations of Mother; and providing for random alcohol screenings of Mother.

The only question presented by Mother is whether these services, under the circumstances of the case, were unreasonable due to the alleged delay in the commencement of Mother's therapy with Elis. It is undisputed that the first contact between the Department and Elis occurred in October 2013 and that Mother's first therapy session with Elis occurred on November 4, 2013. But it is unknown why the first contact and initial therapy session did not occur sooner. This unknown information is exemplary of the basic practical reason for the rule involving the forfeiture of appellate claims. Had Mother asserted below the unreasonableness of the services, (1) there could have been a record developed by the Department explaining the reasons for any delay in referring the matter to Elis and in Elis's commencement of therapy with Mother, and (2) that record could have been considered by the juvenile court before making its findings.

Mother contends that, regardless of any lack of fault of the Department or Mother, "the lengthy delay of seven months was unreasonable on its face." We disagree and decline to adopt such a blanket rule. As noted, the reasonableness of services provided or offered is based upon the individual circumstances of the case. (*Robin V.*, *supra*, 33 Cal.App.4th at p. 1164.) And in reviewing for substantial evidence the juvenile court's finding regarding the reasonableness of services, we " 'must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the [finding].' " (*In re Monica C.*, *supra*, 31 Cal.App.4th at p. 306.) We conclude there was substantial evidence supporting the court's finding here that the Department provided or offered reasonable services to Mother, and that Mother did not meet her burden of proof regarding this claimed error. (See *In re Christopher L.*, *supra*, 143 Cal.App.4th at p. 1333.)

## DISPOSITION

The petition for writ of mandate is denied.

56

_____
                         Márquez, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Grover, J